Filed 12/30/22

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| CHRISTOPHER BOX,<br><br>    Petitioner,<br><br>  v.<br><br>THE SUPERIOR COURT OF<br>SAN DIEGO COUNTY,<br><br>    Respondent;<br><br>THE PEOPLE,<br><br>    Real Party in Interest. | D080573<br><br><br>(San Diego County<br>Super. Ct. No. CR107823) |


Petition for writ of mandate from an order of the Superior Court of San Diego County, Howard H. Shore, Judge.  Petition granted.

Rebecca P. Jones and Knut S. Johnson for Petitioner.

Summer Stephan, District Attorney, Linh Lam, Valerie Ryan, Ron Jakob, and Anne Spitzberg, Deputy District Attorneys, for Real Party in Interest.

Absent waiver of work product privilege, must a prosecutor's jury selection notes be produced in postconviction discovery under Penal Code section 1054.9[1] to facilitate a *Batson/Wheeler* challenge?[2] This is an issue we previously addressed in *People v. Superior Court* (*Jones*) (2019) 34 Cal.App.5th 75 (*Jones I*). In *People v. Superior Court* (*Jones*) (2021) 12 Cal.5th 348 (*Jones II*), the Supreme Court sidestepped the applicability of work product privilege by finding a waiver on the facts of that case. But it did not depublish *Jones I,* nor did it say anything in *Jones II* that cast doubt on our reasoning with respect to the general inapplicability of the work product privilege to jury selection notes in the *Batson/Wheeler* context.

Accordingly, *Jones I* remains good law and we reaffirm the correctness of the conclusions we reached in that opinion. Where a prima facie case of racial bias under *Batson/Wheeler* has been made, a defendant is entitled to discover the prosecution's jury selection notes under section 1054.9. Those notes are not categorically shielded from discovery by the absolute work product privilege. (§ 1054.6; see Code Civ. Proc., § 2018.030, subd. (a).) To the extent the People maintain that those notes reflect the prosecution's impressions, conclusions, opinions, or legal research and theories *about case strategy* independent of conclusions or impressions about *prospective jurors*, they bear the burden to make that foundational proffer and seek appropriate redactions from the trial court.

---

[1] Further undesignated statutory references are to the Penal Code.

[2] See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

FACTUAL AND PROCEDURAL BACKGROUND

In 1990, a San Diego jury convicted petitioner of three counts of first degree murder, attempted premeditated murder, first degree robbery, conspiracy to commit robbery, and residential burglary with associated weapons use enhancements.  After the jury found special circumstances of multiple murder and murder during the commission of robbery and burglary, Box was sentenced to death in 1991.  (*People v. Box* (2000) 23 Cal.4th 1153, 1171 (*Box*).)

Box is African American, his codefendant was Hispanic, and the three murder victims were White.  (*Box, supra,* 23 Cal.4th at p. 1218.)  During jury selection, the prosecutor used two of her peremptory challenges to excuse both African Americans who were seated in the jury box.  Defense counsel objected under *Wheeler*.  Although the court did not find a prima facie showing of racial bias as to either strike, it permitted the prosecutor to state her reasons for excusing the jurors on the record.[3]  Later the prosecutor used a peremptory challenge to excuse an alternate juror, and the defense again raised a *Wheeler* challenge.  The court again found no prima facie case, but permitted the prosecutor to offer reasons for the strike.[4]  The judge then

---

[3]     Each side was given 30 peremptory strikes.  The prosecutor used her third peremptory to excuse African American prospective juror Carl H.  In volunteering reasons, she noted that Carl worked at a waste treatment facility where employees were known to be "high as kites," and she faulted him for minimizing his prior misdemeanor arrests.  The prosecutor later used her 18th peremptory strike to excuse the second African American prospective juror seated in the box, Stephen A.  Stephen's voir dire testimony and the prosecutor's volunteered reasons for striking him are discussed in detail in the discussion.

3

denied the motion, finding the prosecutor had not engaged in "racial discrimination" because she would not have excluded a Black prosecutor or police officer from the jury. Ultimately one African American alternate juror was seated, but none of the 12 jurors who deliberated the verdicts was African American. (See *Box,* at p. 1187.)

On automatic appeal, the Supreme Court rejected Box's claim that the trial court erred in denying his *Batson/Wheeler* motion. (*Box, supra,* 23 Cal.4th at pp. 1188–1190.)[5] Applying the since discredited "strong likelihood or reasonable inference" standard, it upheld the trial court's determination that no prima facie case of purposeful discrimination had been made. (*Box,* at pp. 1188–1189.) It further reasoned that the record "clearly established non-race-related reasons why a prosecutor might want to excuse these

[4]    Jury selection proceeded without questionnaires that would provide demographic information. Whereas defense counsel believed that prospective alternate Stephanie W. was African American, the trial judge was unsure, and the prosecutor did not believe she was. The prosecutor in any event indicated she had stricken Stephanie for her failure to report a residential burglary to police and reentering her apartment accompanied by a neighbor. The court seemed quizzical given the juror's explanation that she had followed the advice of her firefighter friend. Alluding to the possibility that the prosecutor's explanations amounted to shooting herself in the foot, the court commented that she "got one foot with [Stephen A.]" and was now "taking aim on the second one."

[5]    "Although defendant cited only *Wheeler* when making his motions, on appeal a *Wheeler* motion is treated as a motion under *Wheeler* and *Batson*." (*People v. Chism* (2014) 58 Cal.4th 1266, 1309, fn. 14.)

prospective jurors," including their past interactions with police. (*Id.* at p. 1189.)[6]

Box filed petitions for writ of habeas corpus in state court in 2000 (S087643) and 2007 (S153345). Only the first state habeas petition raised a *Batson/Wheeler* claim. Currently he is litigating a *Batson* claim in his federal habeas petition (28 U.S.C. § 2254) pending in the United States District Court for the Southern District of California (04-CV-619-AJB).

The availability of postconviction discovery of a prosecutor's jury selection notes came before this court in *Jones I*, which was affirmed on narrower grounds in *Jones II*. (See discussion, *post.*) In January 2022, shortly after the California Supreme Court decided *Jones II*, Box filed a motion to compel the District Attorney to produce copies of the trial prosecutor's jury selection notes to support his federal habeas claim of *Batson* error. The People admitted that the requested notes had been located, but objected to their production on grounds of work product privilege. Urging the court to construe *Jones II* as standing for the narrow holding that work product privilege over juror notes could be *waived*, the District Attorney asserted that no such waiver had occurred in this case.

6    In *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*), the United States Supreme Court held that California courts had been applying "an inappropriate yardstick by which to measure the sufficiency of a prima facie case." (*Id.* at p. 168.) Rather than impose an evidentiary burden at the outset, "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson,* at p. 170.) Moreover, the question is not whether "the prosecutor's strikes could be justified by race neutral reasons" imagined by the court (*id.* at p. 165), but rather whether the *actual reason* jurors were stricken was discriminatory (*id.* at p. 172). Federal courts have since reasoned that *Box* was abrogated by *Johnson*. (*Shirley v. Yates* (9th Cir. 2015) 807 F.3d 1090, 1101; *Johnson v. Finn* (9th Cir. 2011) 665 F.3d 1063, 1068.)

5

At a law and motion hearing in March 2022, Judge Howard Shore asked for clarification of language at the end of *Jones II* suggesting that disclosure of jury notes *could* in certain cases "risk unnecessary incursion on the confidentiality of attorney work product" and "reveal opinions and impressions of the case and legal strategy." (See *Jones II, supra,* 12 Cal.5th at p. 366.) In such a case, *Jones II* suggested the trial court could on a foundational showing undertake an in camera review to determine whether absolute work product protection applied to some or all of the material and make necessary redactions "to protect core work product that is not relevant to the *Batson/Wheeler* challenge at issue." (*Jones II,* at p. 366.) Defense counsel replied that this simply meant the People could make a foundational proffer that the notes contained privileged work product, but no proffer had been made to warrant such review here. Moreover, defense counsel argued that the jury selection notes were not privileged work product as held in *Jones I.*

In an abundance of caution, the court decided to review the jury selection notes in camera. The People filed a motion to reconsider the in camera review, which the court denied. In May 2022, after reviewing the 34 pages of notes, Judge Shore denied the motion to compel. Assuming the absolute work product privilege applied, the court determined that the prosecutor had not made testimonial use of those notes to waive that privilege during jury selection.

Box filed this petition for writ of mandate in June requesting we vacate the trial court's order and direct it to grant the motion to compel. We issued an order to show cause. The District Attorney filed a formal return, and Box filed a traverse.

DISCUSSION

Box contends the trial court should have granted his discovery motion. He asserts the court erred in presuming an applicable work product privilege, claiming that *Jones I* remains good law. He further maintains that even if the jury notes were privileged, the court should have found that the prosecutor waived the privilege in referring to her notes during jury selection.

To understand Box's claims, and our conclusion that mandamus relief is warranted, we begin with an exploration of relevant case and statutory authority. We then address three threshold procedural arguments raised by the People before explaining why we agree with Box on the merits that absolute work product privilege does not apply to the entirety of the prosecutor's notes. Because the trial court applied the incorrect standard, we find it appropriate to direct the court to reconsider the discovery motion in the first instance guided by this opinion.

A.   *Legal Principles*

More than forty years ago, the California Supreme Court held in *Wheeler, supra,* 22 Cal.3d 258 that the use of peremptory challenges to remove prospective jurors on the basis of group bias violated the state constitutional right to a jury trial before a representative cross-section of the community. (*Id.* at pp. 276–277; see Cal. Const., art. I, § 16.) In 1986, the United States Supreme Court similarly concluded that discriminatory use of peremptory strikes violated the Equal Protection Clause of the Fourteenth Amendment to the federal constitution. (*Batson, supra,* 476 U.S. at p. 86.) Together, *Batson* and *Wheeler* give litigants the right to challenge an opponent's purposeful discrimination in exercising preemptive strikes.

Trial courts use a three step burden-shifting framework to evaluate *Batson/Wheeler* claims. A moving defendant bears the burden to show a

7

prima facie case of discriminatory purpose in the exercise of peremptory challenges. If the prima facie case has been made, the burden shifts to the prosecution to provide a race-neutral reason for the strike. In the third stage, trial courts decide whether the defendant has met his or her ultimate burden to prove purposeful discrimination. (*People v. Scott* (2015) 61 Cal.4th 363, 383 (*Scott*).) Often, the stage-three inquiry comes down to whether the trial court finds the prosecutor's stated reasons for the strike credible. (*Jones II, supra,* 12 Cal.5th at pp. 357–358.)

Criminal discovery procedures are detailed in sections 1054 et seq. No discovery is allowed except as statutorily authorized or mandated by the federal constitution. (§ 1054, subd. (e).) Certain mandatory disclosure obligations are placed on the prosecution and defense. (§§ 1054.1, 1054.3.) Under section 1054.6, neither side "is required to disclose any materials or information which are work product as defined in subdivision (a) of Section 2018.030 of the Code of Civil Procedure . . . ." In turn, section 2018.030, subdivision (a) of the Code of Civil Procedure defines as core work product "an attorney's impressions, conclusions, opinions, or legal research or theories." Because section 1054.6 refers expressly to this subdivision and not the qualified work product privilege codified at Code of Civil Procedure section 2018,030, subdivision (b), only core work product is shielded from discovery in criminal cases. (*Jones I, supra,* 34 Cal.App.5th at pp. 80–81, citing *People v. Zamudio* (2008) 43 Cal.4th 327, 355.)

*Postconviction* discovery is governed by section 1054.9, which provides a limited statutory right to discovery for defendants sentenced to a term of 15

years or more.[7]  A defendant may file a discovery motion in connection with pending or prospective habeas corpus proceedings and motions to vacate a judgment.  (§ 1054.9, subd. (a).)  Upon a showing of good faith but unsuccessful efforts to obtain discovery materials from trial counsel, a defendant shall be provided reasonable access to any discovery materials he would have been entitled to at trial.  (§ 1054.9, subds. (a), (c).)

This case involves the interplay between postconviction discovery and habeas challenges under *Batson/Wheeler*.  Because this court's prior decision in *Jones I* is central to our analysis, we discuss the case in some detail.

Convicted of capital murder in 1994, Bryan Jones filed a state petition for habeas corpus twenty years later raising a *Batson/Wheeler* challenge to the prosecutor's peremptory strikes of three African American prospective jurors.  The trial court had denied defendant's *Batson/Wheeler* motion.  Although it found a prima facie case of discrimination, it accepted the prosecutor's explanation that the strikes were based on an internal numeric jury rating system.  (*Jones I, supra,* 34 Cal.App.5th at p. 78.)  When his habeas corpus attorney sought postconviction discovery of the prosecutor's jury selection notes twenty years later, the court granted the discovery request.  (*Id.* at p. 79.)

The People petitioned for writ of mandate and/or prohibition in *Jones I*, and we upheld the trial court's discovery order on two alternative grounds.  First, and most relevant here, we concluded that there was no absolute work

_____

[7]    Prior to January 1, 2019, section 1054.9 applied only to defendants sentenced to death or life imprisonment without possibility of parole.  (See Stats. 2002, ch. 1105, § 1; Stats. 2018, ch. 482, § 2.)  Most recently, the Legislature expanded the statute to cover defendants who had ever been convicted of a serious or violent felony resulting in a sentence of 15 or more years.  (Stats. 2019, ch. 483, § 1.)

9

product privilege protecting a prosecutor's jury selection notes from discovery where the defendant established a prima facie case of purposeful discrimination under *Batson/Wheeler.* (*Jones I, supra,* 34 Cal.App.5th at p. 81.) We highlighted discussion in *Foster v. Chatman* (2016) 578 U.S. 488 suggesting that a prosecutor's notes are probative in evaluating the actual reasons behind a strike. (*Jones I,* at p. 81.) Although the notes would undoubtedly reveal the prosecutor's impressions, conclusions, or opinions *about prospective jurors,* we found it less clear that they would reveal any such impressions about the prosecutor's legal theory of the case. (*Id.* at p. 82.) In the third stage of *Batson/Wheeler,* where the very object is to evaluate the genuineness of the prosecutor's stated reasons for excusing a prospective juror, we reasoned that constitutional principles outweighed concerns over protecting work product. (*Jones I,* at p. 82.) As such, the trial court did not err in granting defendant discovery of the prosecutor's jury selection notes. (*Id.* at p. 83.)[8]

---

[8] We framed the applicable review standard as abuse of discretion, the standard typically applied for discovery rulings. (*Jones I, supra,* 34 Cal.App.5th at p. 79.) But "[t]he abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712.) As to the legal question of whether absolute work product privilege shields a prosecutor's jury selection notes from postconviction discovery, *Jones I* applied independent review, as we do here.

As a separate and alternative ground, we held in *Jones I* that even if the prosecutor's jury selection notes were shielded from discovery under section 1054.6 by the absolute work product privilege, the prosecutor had *waived* the privilege by expressly referring to their contents during the *Batson/Wheeler* hearing. (*Jones I, supra,* 34 Cal.App.5th at pp. 83−85.) We noted that work product protection is waived when a witness testifies as to the work's content. (*Id.* at pp. 83−84.) Observing that a prosecutor is generally the sole relevant witness in a *Batson/Wheeler* hearing, we concluded that his reference to his jury selection notes throughout voir dire waived any work product privilege. (*Jones I,* at p. 84.) The prosecutor justified the strikes by claiming he had numerically evaluated jurors based on questionnaires and shared those numeric ratings with the court, waiving any claim to privilege. (*Id.* at pp. 84−85.)

The People petitioned for review, and the Supreme Court affirmed in *Jones II, supra,* 12 Cal.5th 348 by following the narrower of the two grounds articulated in *Jones I.* Noting the difference between absolute and qualified work product privilege, the Supreme Court sidestepped the broader question of whether jury selection notes are entitled to absolute protection under Code of Civil Procedure section 2018.030, subdivision (a). (*Jones II,* at p. 362.) Instead, it agreed with our conclusion in *Jones I* that any work product protection had been waived under the facts of the case. (*Jones II,* at p. 362.) By invoking an undisclosed juror rating system in his notes to justify his peremptory strikes during the second stage of the *Batson/Wheeler* inquiry, the prosecutor put the substance of any privileged material at issue. (*Jones II,* at pp. 364−365.) Neither the defense nor the trial court had a way to evaluate whether a juror rating system they had never seen was truly race-neutral. (*Id.* at p. 365.) The court was careful to say that waiver would not

11

occur where an attorney "simply glances at her or his notes to recall a particular answer provided during voir dire" and instead was limited to instances where attorneys made " 'testimonial use' " of undisclosed writings. (*Ibid.*)

In following this narrower path, *Jones II* observed that the law provides a remedy against overbroad discovery. "Though the notes may illuminate an attorney's opinions and impressions of prospective jurors—the matter specifically at issue in a *Batson/Wheeler* claim—they may also reveal opinions and impressions of the case and legal strategy." (*Jones II, supra,* 12 Cal.5th at p. 366.) The People could resist overbroad discovery by making a foundational proffer that disclosure would reveal impressions, opinions, or legal research or theories unrelated to jury selection. Upon an adequate showing, the court could determine through in camera inspection whether absolute work product protection applied to some or all of the material. (*Ibid.*) "In this way, the trial court may ensure on a 'case by case' basis [citation] that necessary redactions are made to protect core work product that is not relevant to the *Batson/Wheeler* challenge at issue." (*Jones II,* at p. 366.)

B.    *Threshold Procedural Challenges*

Box's petition raises an issue discussed by this court in *Jones I* but largely sidestepped by the Supreme Court in *Jones II.* Regardless of any issue of waiver, are a prosecutor's jury selection notes core work product shielded from disclosure in postconviction proceedings that raise a *Batson* claim? Before we reach this issue on the merits, we must address three threshold procedural challenges raised by the People.

1.    *No pending state habeas petition*

The People argue that this case is unlike *Jones I/II* because there is no pending or anticipated state habeas petition. Section 1054.9, subdivision (a) entitles defendants convicted of a serious or violent felony to postconviction discovery "upon the prosecution of . . . a postconviction writ of habeas corpus or a motion to vacate a judgment," or "in preparation to file that writ or motion." (Italics omitted.) Box currently has no pending state habeas petition. He is currently prosecuting a federal habeas petition after exhausting his state remedies.

But as Box suggests, nothing in section 1054.9 limits postconviction discovery to a pending or anticipated habeas petition in *state* court. Although federal courts have their own discovery procedures, there is nothing in the plain language of section 1054.9 that would preclude Box from seeking postconviction discovery in state court to support his pending federal petition. (See, e.g., *Caitlin v. Superior Court* (2011) 51 Cal.4th 300, 307 [plain language of section 1054.9 does not permit trial court to deny a postconviction discovery request as untimely].) And even if it did, Box could seek discovery in "preparation to file" a new state habeas petition. (§ 1054.9, subd. (a); see *In re Steele* (2004) 32 Cal.4th 682, 691 (*Steele*) [postconviction discovery under section 1054.9 is available "to assist in stating a prima facie case for relief"].)[9]

---

[9]    Effective January 1, 2023, section 1473 will permit a habeas corpus petition based on newly discovered evidence of racial bias in a criminal conviction or sentence. (Stats. 2022, ch. 739, § 3.5(f) (Assem. Bill No. 256).) The parties do not address, nor do we consider, whether this might apply to Box.

## 2.    *No mandatory disclosure obligations*

Next, the People maintain that Box is not entitled to discovery of the prosecutor's jury selection notes because they are not subject to mandatory disclosure under section 1054.1.[10]  This contention requires little discussion.  "[T]he fact that jury selection notes are not included in Penal Code section 1054.1 as items of mandatory pretrial discovery, along with witness lists and defendant statements, does not mean that the jury selection notes are not discoverable under section 1054.9." (*Jones II, supra,* 12 Cal.5th at p. 361, fn. 9.)  Section 1054.9, subdivision (c) entitles a defendant to discovery materials to which he "would have been entitled at the time of trial."  "Use of the conditional perfect tense–'would have been'–indicates the Legislature intended broader discovery than just materials to which the defendant *was* entitled." (*In re Steele, supra,* 32 Cal.4th at p. 696.)  It includes " 'materials to which the defendant *would have been entitled* had he or she requested them.' " (*Ibid.*; see § 1054, subd. (e) [discovery may be mandated by other express statutory provisions or the federal constitution].)  So the fact that Box did not request the notes during the original trial is irrelevant.  Indeed, the only reason the People suggest Box would not be entitled to the jury selection notes is their assertion of work product privilege, a claim we address and reject on the merits (*post*).

---

10    Section 1054.1 requires the prosecution to disclose to the defense names and addresses of anticipated trial witnesses, statements of all defendants, real evidence seized or obtained during the investigation, felony convictions of material witnesses, and any written or recorded witness statements or reports.

### 3. *Not a stage-three Batson/Wheeler case*

Finally, the People maintain that Box is not entitled to postconviction discovery of the prosecutor's jury selection notes because, unlike in *Jones I/II*, the trial court never found a prima facie case of racial bias under *Batson/Wheeler*. Arguing Box's case "is not a third-stage case," the People suggest that the prosecutor's jury selection notes would not have been discoverable at trial had he requested them. This argument has superficial appeal. Trial courts are encouraged to offer prosecutors the opportunity to state their reasons for a strike, even in the absence of a prima facie showing, to create an adequate record for the appellate court. (*People v. Howard* (2008) 42 Cal.4th 1000, 1020.) In doing so, prosecutors do not convert a first-stage *Batson/Wheeler* case into a third-stage one. (*Howard,* at p. 1020.) Unless the defendant makes a prima facie case of purposeful discrimination, the prosecutor's reasons for the strike and the credibility of those reasons are not at issue. (See *Scott, supra,* 61 Cal.4th at pp. 387–388 ["a party exercising a strike . . . has no obligation to articulate a reason until an inference of discrimination has been raised"].)

But as Box points out, his trial predated *Johnson*, which concluded that California courts had been applying the wrong standard to determine whether a moving party stated a prima facie case. (*Johnson, supra,* 545 U.S. at p. 168.) For trials predating *Johnson*, reviewing courts must independently conduct the prima facie inquiry. (*Scott, supra,* 61 Cal.4th at p. 384.) In the rare case in which "a prosecutor volunteers a justification for a strike that is discriminatory on its face," reviewing courts must consider this proffered justification "with the totality of relevant facts to determine whether they give rise to an inference of discriminatory purpose and thus compel analysis of the subsequent steps in the *Batson/Wheeler* framework."

15

(*Scott,* at p. 391.)  "In the circumstance where (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror on the record, (3) the prosecutor provides a reason that is discriminatory on its face, and (4) the trial court nonetheless finds no purposeful discrimination, the appellate court should likewise begin its analysis of the trial court's denial of the *Batson/Wheeler* motion with a review of the first-stage ruling.  In that (likely rare) situation, though, the relevant circumstances, including the facially discriminatory justification advanced by the prosecutor, would almost certainly raise an inference of discrimination and therefore trigger review of the next step of the *Batson/Wheeler* analysis."  (*Scott,* at pp. 391–392.)

This is that rare case *Scott* envisioned.  Excusal of all African American prospective jurors in a trial involving an African American defendant accused of killing White victims raises " 'heightened concerns.' "  (See *People v. Ramirez* (2022) 13 Cal.5th 997, 1089.)  Bearing in mind that a prima facie showing requires only a reasonable inference of purposeful discrimination (*Johnson, supra,* 545 U.S. at p. 170), several of the prosecutor's volunteered reasons for striking the second of two African American jurors from the jury give rise to such an inference.  The trial court indicated as much, suggesting that the prosecutor's explanations were a self-inflicted injury and remarking that many of her reasons for striking that second juror were "of the type of which the appellate courts have been critical."  What jumps out from our review of the record is that while voir dire may have revealed some plausible bases to strike that juror, the prosecutor instead volunteered suspect factors such as his syntax and grammar to justify the strike.

16

Prospective Juror Stephen A. was a machinist who made aircraft parts. He had been married for four years to his wife, a loan counselor, and they lived with their three children in Spring Valley. This would be his first time serving on a jury. When the court named those on the trial witness list, Stephen said he knew one potential defense character witness as a "football coach at City College."

Counsel then examined Stephen in chambers. Stephen explained that he had grown up in the same neighborhood as the coach, who was a few years older than him. He was just an acquaintance, and Stephen did not feel their relationship would affect his view of any testimony. He said the coach was known in the neighborhood as an athlete—someone who did something with his life, similar to how people viewed Stephen. The prosecutor asked about the neighborhood that Stephen grew up in; Stephen said he grew up around Lincoln Park. When Stephen left, the prosecutor expressed concern that he would know of witnesses from Lincoln Park, but the trial judge reminded her that Stephen had moved out of the neighborhood and said he did not follow gossip.

Later in voir dire, Stephen raised his hand when asked who had heard about the case. He remembered the case from the news, and the only thing that stuck out in his head was that the accused "was an athlete from Clairemont." He also raised his hand to disclose that he had "friends and relatives that have gotten shot," and "friends that have gotten accused [of] shooting people." They again went in chambers.

In chambers, Stephen clarified that the shootings were not accidents and involved drug disputes; some went to court. A couple of Stephen's relatives had been shot by law enforcement. These experiences left him with "a few opinions," albeit not strong ones, that police sometimes made arrests to meet quotas. But he did not feel all police were the same; his cousin was a detective, and he judged law enforcement officers on their individual merits. The prosecutor followed up on the shootings that occurred in San Diego. Stephen said one uncle and three friends were shot, clarifying when asked that they all had been killed. Although several people in the neighborhood had been accused of being involved in shootings, Stephen no longer lived there to know firsthand.

Once Stephen left the judge's chambers, defense counsel remarked that "the leading cause of the death of young black men is gunshot wounds." The court replied, "All he's done is grow up in this neighborhood. Wonderful." Back in open court, Stephen raised his hand when asked if he had any law enforcement ties. He said he had a "close friend that's a detective in the San Diego Police Department," but did not feel that friendship would affect his evaluation of the case.

Stephen remained on the jury as the People excused three additional jurors. The People then excused Stephen from the jury. At that point, defense counsel raised a *Wheeler* motion on grounds the prosecution had excused the only two "young Black male jurors" who had been seated in the jury box. The court did not find a prima facie case of purposeful discrimination but nevertheless allowed the prosecutor to state her reasons for the record.

The prosecutor faulted Stephen for describing friends as being "shot" rather than "killed." She commented that Stephen had a hairstyle similar to

Box at the time of his arrest—"flat on the top" with a "triangular level cutting at the back that was very popular with young people today." Defense counsel quipped, "mainly Blacks," and cocounsel remarked that she didn't know "very many White people with haircuts like that." To this, the prosecutor responded that she had seen her hairdresser "write initials the same way as with Black people" for other clients.[11] She then moved on, stating Stephen's grammar was extremely poor (a characterization not borne out by the voir dire transcript) and that his syntax led her to believe at first that "he might be illiterate." Even after coming back into chambers, his speech seemed to very slow compared to other jurors.

She went on. Stephen knew a potential defense trial witness (the football coach) from his childhood. Despite his denials, the prosecutor found it hard to believe this would not influence his view of the coach's testimony. In recalling news coverage about the case, Stephen remembered that "the defendants were athletes from Clairemont, whereas everyone else who remembers the news generally remembers that there was a baby killed, that individuals were killed." He pronounced the word "*po*lice" by emphasizing its first syllable, which suggested to the prosecutor an unfriendly feeling toward law enforcement. Again, she observed that Stephen used the word "shot" instead of "killed" in describing what had happened to his friends and relatives. She also referenced his comment that police made arrests to meet quotas and didn't always have the facts when bringing in people on technicalities. Finally, she claimed Stephen was late.

---

11    These reasons were given as the prosecutor searched for her notes. It is not clear whether she found them and proceeded to give other reasons for striking Stephen A. based on what was written in those notes.

19

" '[T]he constitution forbids striking even a single prospective juror for a discriminatory purpose.' " (*Snyder v. Louisiana* (2008) 552 U.S. 472, 478, quoting *U.S. v. Vasquez-Lopez* (9th Cir. 1994) 22 F.3d 900, 902; see *People v. Silva* (2001) 25 Cal.4th 345, 386; *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1172.) On our record, several of the prosecutor's volunteered justifications for striking prospective juror Stephen A. are sufficient to permit an inference that the prosecutor's motives were discriminatory, placing her credibility (and her jury selection notes) at issue. (*Scott, supra,* 61 Cal.4th at pp. 391–392.) By focusing on Stephen's syntax and haircut and faulting him for grammatical mistakes nowhere present in our record, the prosecutor's remarks push Box past the prima facie threshold. Indeed, reasons such as personal appearance, vernacular, neighborhood, and beliefs that law enforcement engage in racial profiling have been legislatively recognized (since January 1, 2022) as presumptively invalid bases for peremptory challenges in criminal trials. (Code Civ. Proc., § 231.7, subd. (e); Stats. 2020, ch. 318, § 2 (Assem. Bill No. 3070).)[12]

Having rejected each of the threshold procedural challenges raised by the People, we proceed to address the merits of the discovery ruling.

C.    *Jury Selection Notes and the Work Product Privilege*

As in *Jones*, Box makes two alternative arguments: (1) the work product privilege does not apply to shield a prosecutor's jury selection notes from discovery in a *Batson/Wheeler* challenge; and (2) even if it does, the

---

[12]    Although the prosecutor included race-neutral reasons in her list, such as Stephen's familiarity with the football coach and recollection of news coverage about the case, all that is required in stage one of *Batson/Wheeler* is a reasonable inference of purposeful discrimination. Whether the prosecutor was, in fact, motivated by race-neutral considerations is a stage-three determination.

privilege was waived by the prosecution's reference to the notes in explaining the basis for its use of peremptory challenges. Either argument, if successful, would result in disclosure of at least a portion of the notes.

Perhaps because the Supreme Court's *Jones II* opinion focused on the waiver issue, the crux of the People's argument here is that the prosecutor did not make testimonial use of her jury selection notes during voir dire so as to waive any work product privilege. Although she referred to her notes to refresh her recollection, she stated those justifications on the record and therefore did not place her notes at issue. Box, by contrast, suggests that by relying on her notes to proffer justification for her strikes, she placed them at issue.

The Supreme Court found waiver in *Jones II* because the prosecution "pointed to the documented results of a purportedly color-blind numerical rating system" it had devised. (*Jones II, supra,* 12 Cal.5th at p. 365.) Explaining that "[a] striking attorney cannot both stand on such a rating system and assert privilege over it," *Jones II* found that any claim of work product privilege had been waived. (*Ibid.*) But the court's opinion suggested that waiver would not occur if an attorney "simply glances at her or his notes to recall a particular answer provided during voir dire." (*Id.* at p. 365.) Because the prosecutor here placed no reliance on any rating system, the circumstances of this case seem much closer to a "glance" at notes as a means of refreshing recollection that the *Jones II* court characterized as unobjectionable.

But even if we assume there was no waiver, Box's writ petition raises the fundamental question presented in *Jones I* but sidestepped in *Jones II*: whether an attorney's jury selection notes are core work product shielded from discovery pursuant to section 1054.6 where a *Batson/Wheeler* claim has

21

proceeded past the first stage. The *Jones II* court found it unnecessary to "resolve this broad dispute about the reach of the work product protection to answer the question before [it]" where, on the facts, any such privilege had been impliedly waived. (*Jones II, supra,* 12 Cal.5th at p. 362.) In affirming *Jones I* on narrower grounds, the Supreme Court did not order this court's prior opinion depublished. Because nothing in *Jones I* is "inconsistent with" or "disapproved by" *Jones II*, *Jones I* remains citable and precedential. (Cal. Rules of Court, rule 8.1115(e)(2).)

Having carefully considered the People's countervailing arguments, we have no reason to depart from this court's ruling in *Jones I.* In deciding whether work product protection applies, it is crucial to consider the underlying policy concerns. Work product privilege serves to "(a) [p]reserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases" and "(b) [p]revent attorneys from taking undue advantage of their adversary's industry and efforts." (Code Civ. Proc., § 2018.020.) "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system." (*United States v. Nobles* (1975) 422 U.S. 225, 238.)

Voir dire serves to probe each juror's state of mind to allow the trial judge to determine actual bias and permit the parties to evaluate suspected biases. (*Johnson v. Finn* (E.D. Cal. Oct. 31, 2007, No. CIV-S-03-2063-RBB JFM P) 2007 U.S. Dist. Lexis 101185 at p. *5.) " 'The only objective of peremptory challenges is to obtain an impartial jury, and no litigant is

22

entitled to select a jury to its liking.' " (*Ibid.*; see generally, *Wheeler, supra,* 22 Cal.3d at pp. 274–275 [peremptory challenges serve to produce an impartial jury].) The discriminatory use of peremptory challenges in jury selection not only affects individual litigants; it also undermines the integrity of our courts and public respect for our criminal justice system. (*Jones II, supra,* 12 Cal.5th at p. 357; *Scott, supra,* 61 Cal.4th at p. 390.)[13]

It seems unlikely that a prosecutor's jury selection notes will reveal impressions, conclusions, or opinions about the legal theory of the case, as opposed to impressions about particular jurors. (*Johnson v. Finn, supra,* 2007 U.S. Dist. Lexis 101185 at p. *5; *Jones I, supra,* 34 Cal.App.5th at p. 82.) And the constitutional imperative of rooting out discrimination in the jury selection process cautions against a broad work product privilege where a prima facie case of racial bias under *Batson/Wheeler* has been made. (*Jones I,* at p. 83; *Johnson v. Finn,* at p. *10 ["The discovery is not sought to exploit the prosecution's efforts in preparing for litigation. Rather, petitioners seek this information to pursue their constitutional right to equal protection, which outweighs any interest the state may retain in these prosecutor's notes."].)

"The *Batson* framework is designed to produce *actual answers* to suspicions and inferences that discrimination may have infected the jury selection process." (*Johnson, supra,* 545 U.S. at p. 172, italics added.) It "provides an opportunity to the prosecutor to give the reason for striking the

---

13    Although peremptory strikes have a long historical pedigree in American jury trials, some have questioned whether *Batson* can eliminate purposeful discrimination in jury selection and instead have called for abandoning peremptory strikes altogether. (*Batson, supra,* 476 U.S. at p. 107 (conc. opn. of Marshall, J.); *Miller-El v. Dretke* (2005) 545 U.S. 231, 273 (conc. opn. of Breyer, J.) (*Miller-El*).)

juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." (*Miller-El, supra,* 545 U.S. at pp. 251–252.) This truth-seeking mission is ill-served by shielding a prosecutor's jury selection notes from discovery where a prima facie case of purposeful discrimination under *Batson/Wheeler* has been made.[14]

That is not to say that the entirety of the notes would be discoverable in every instance where a prima facie case is made, regardless of how the particular information bears on a prosecutor's reasons for the strike. *Jones II* offers helpful guidance in that regard. Jury selection notes might on the one hand "illuminate an attorney's opinions and impressions of prospective jurors—the matter specifically at issue in a *Batson/Wheeler* claim—[but] they may also reveal opinions and impressions of the case and legal strategy." (*Jones II, supra,* 12 Cal.5th at p. 366.) Where the People are concerned about overbroad discovery, they must make a foundational showing that disclosure of jury selection notes would reveal impressions, conclusions, opinions, or legal research or theories that are "unrelated to jury selection." (*Ibid.*) Upon an adequate proffer, the trial court may order in camera inspection and

---

[14] Commentators have suggested that a prosecutor's jury selection notes might be subject to fewer work product protections when requested in postconviction proceedings rather than during trial. (Abel, *Batson's Appellate Appeal and Trial Tribulations* (2018) 118 Colum. L.Rev. 713, 739–740 ["there is simply less justification for protecting the prosecutor's strategy and tactics once the trial has already run its course"].) At the same time, section 1054.9, subdivision (c) limits postconviction discovery to the materials a defendant would have been entitled to receive at trial. We can appreciate how discovery requests during trial might present unique issues, but have no occasion to evaluate any differences in discovery of jury selection notes following a prima facie *Batson/Wheeler* showing at trial versus in postconviction proceedings. Here we are faced squarely with the question of postconviction discovery, and we address the discoverability of this prosecutor's jury selection notes in that specific context.

ensure that necessary redactions are made on a case-by-case basis "to protect core work product that is not relevant to the *Batson/Wheeler* challenge at issue." (*Jones II,* at p. 366.)[15]

We add this useful caveat to cabin the rule articulated in *Jones I.* Where a defendant makes a prima facie case under *Batson/Wheeler*, the prosecution's jury selection notes become relevant and discoverable for purposes of the stage-three analysis. There is no categorical bar to discovery under the absolute work product privilege. But to the extent the People believe that producing the requested notes would reveal a prosecutor's mental impressions *about the case* rather than his or her reasons for striking a particular juror, core work product privilege might apply to shield some *portion* of the notes from discovery. To assert this claim, the People must make a foundational proffer as to how information in the notes would bear on the prosecution's case strategy. The trial court may then conduct an in camera review and order the necessary redactions. (*Jones II, supra,* 12 Cal.5th at p. 366.)

---

15    The *Jones II* court adopted this procedure from *Coito v. Superior Court* (2012) 54 Cal.4th 480 at pages 495 to 496, a case evaluating absolute work product protection of recorded witness interviews. The People maintain that this procedure applies *only* where work product privilege has been waived. They urge that outside the waiver context, "*Coito* cannot be used to impose a requirement that a foundational showing of attorney work product privilege be made before denying the production of jury selection notes in a criminal case." We do not read *Jones II* so narrowly. The Supreme Court rejected a categorical bar to production in *Jones II* because the work product privilege had been waived *in that case.* It then proceeded to evaluate whether, despite the lack of categorical protection, some material in the prosecutor's jury selection notes might nonetheless be shielded from discovery as protected work product. (*Jones II, supra,* 12 Cal.5th at p. 366.) Rejecting a categorical bar to production for different reasons here, we adopt the same procedure for evaluating any necessary redactions.

Although the trial court here conducted an in camera review of the prosecutor's jury selection notes, it did so in an attempt to answer the wrong question.[16] An in camera review is only permissible to decide whether otherwise discoverable portions of the prosecutor's notes reveal mental impressions about the theory of the case. Here, the court reviewed the notes to confirm its tentative conclusion that the prosecutor had not *waived* any work product privilege, an issue to which the notes were not relevant.

The court never addressed Box's argument that under *Jones I,* the prosecutor's jury selection notes were not covered by the absolute work product privilege. Nor were the People asked to make a foundational proffer showing why producing the jury selection notes would disclose privileged work product unrelated to the *Batson/Wheeler* inquiry. And after the in camera review, the court likewise never indicated whether any of the material it reviewed bore on the *Batson/Wheeler* inquiry.

Box suggests that we compel disclosure on this record. Instead, we believe the appropriate course is to return the matter to the trial court for further consideration of Box's motion to compel, applying the correct standard. Unless the People articulate a foundational basis for shielding some portion of the jury selection notes from discovery, those materials must

---

16    The People might have contributed to the confusion. During the hearing on Box's motion to compel, the court stated its intent to conduct in camera review of the jury selection notes to see if it found anything remotely relevant to an impermissible basis for excusing a juror, in which case it would order further proceedings. The People moved for reconsideration of the decision to conduct in camera review, claiming such review was permitted under *Jones II* only where the defense first established waiver of the work product privilege. In a written order denying reconsideration, the court commented that it could not decide waiver without conducting an in camera review. After reviewing the notes in camera, the court assumed privilege and found the prosecutor had not waived that privilege during voir dire.

be turned over to Box in their entirety.  If the People make an adequate foundational proffer, the trial court may proceed to decide whether any redactions are necessary.[17]

## DISPOSITION

Let a peremptory writ of mandate issue directing the Superior Court of San Diego County to vacate the order denying Box's motion to compel postconviction discovery pursuant to section 1054.9.  The court is directed to reconsider Box's motion based on the standards articulated in this opinion.

DATO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.

---

[17]    We decline Box's invitation to give "Mr. Box's counsel access to those notes now, under a protective order that would prohibit their use in litigation until the question of privilege has been resolved, so that counsel may provide the advocacy necessary for this Court to resolve the question before it."  We are able to reach a ruling in Box's favor on the record before us.